06 cv 2307

C4

# CERTIFIED COPY

## In the

# United States Court of Appeals

## For the Seventh Circuit

FILED

DEC 0 1 2008 RC

Dec 01 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT.

No. 07-1131

JOHNBULL K. OSAGIEDE,

*Petitioner-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-02307—Charles P. Kocoras, *Judge.*

ARGUED APRIL 1, 2008—DECIDED SEPTEMBER 9, 2008

Before CUDAHY, RIPPLE and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Johnbull K. Osagiede, a Nigerian national, pleaded guilty to one count of heroin distribution and was sentenced to more than eight years in federal prison. On April 25, 2006, he filed a pro se petition for a writ of habeas corpus in the Northern District of Illinois. *See* 28 U.S.C. § 2255(a). He claimed, inter alia, that he was denied his Sixth Amendment right to the effective assistance of counsel, *see Strickland v. Washington,* 466 U.S.

668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984), because his lawyer sought no remedy for the Government's failure to notify him of his right to consular assistance under the Vienna Convention on Consular Relations, art. 36, April 24, 1962, 21 U.S.T. 77, 596 U.N.T.S. 261. The Government conceded that it had failed to inform Osagiede of his right, in clear violation of the Article 36. Nevertheless, the district court dismissed Osagiede's petition without an evidentiary hearing. *See* 28 U.S.C. § 2255(b). The district judge reasoned that any attempt by Osagiede's lawyer to remedy the Article 36 violation would have been futile.

Osagiede then filed a pro se application for a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). We construed Osagiede's petition liberally and determined that he had made a "substantial showing" of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). We framed the relevant issue as follows: whether Osagiede's counsel was ineffective for failing to seek *a remedy* for the Article 36 violation.

## I.

The Vienna Convention "is an international treaty that governs relations between individual nations and foreign consular officials." *Sanchez-Llamas v. Oregon,* 548 U.S. 331, 336, 126 S. Ct. 2669, 165 L. Ed.2d 557 (2006) (Breyer, J., dissenting). The adoption of the Vienna Convention by the international community was "the single most important event in the entire history of the consular institution." LUKE T. LEE, CONSULAR LAW AND PRACTICE 26 (2d ed. 1991).

No. 07-1131

3

When the United States ratified the treaty in 1969, it became the "supreme Law of the Land." U.S. CONST. art. VI, cl. 2.

The Convention contains seventy-nine articles, many of which address the rights of local consulates and consular officials, the respective obligations of sending and receiving nations and matters such as tax-exempt status and legal immunity. Article 36, however, is unique: it is phrased in terms of the detained foreign national and his or her individual rights. *See Jogi v. Voges (Jogi II)*, 480 F.3d 822, 831-35 (7th Cir. 2007). Article 36 imposes three separate obligations on a detaining authority: (1) inform the consulate of a foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay, and (3) inform a detained foreign national of "his rights" under Article 36 without delay. Vienna Convention, art. 36(1)(b), 21 U.S.T. 77, 596 U.N.T.S. 261. Although this third obligation might be more properly termed a "right to notification," the right embodied in Article 36 as a whole is commonly referred to as the "right to consular assistance." The right to consular assistance has been codified in federal regulations promulgated to ensure compliance with Article 36. *See* 28 C.F.R. § 50.5 (2003) (requiring the Department of Justice to comply with Article 36); 8 C.F.R. § 236.1(e) (2003) (requiring the Immigration and Naturalization Service to comply with Article 36). Further, federal law enforcement agencies have also long been instructed by the State Department that they must comply with the requirements of Article 36. *See* U.S. Department of State, Pub. No. 10518, CONSULAR NOTI-

FICATION AND ACCESS: INSTRUCTION FOR FEDERAL, STATE
AND LOCAL ENFORCEMENT AND OTHER OFFICIALS REGARD-
ING FOREIGN NATIONALS IN THE UNITED STATES 13-15 (Jan.
1998) ("when foreign nationals are arrested or detained,
they must be advised of the right to have their consular
officials notified").

Article 36 furthers an essential consular function:
"protecting . . . the interests of the sending State and of its
nationals." Vienna Convention, arts. 5(a), (e), 21 U.S.T. at
82-83. This "protective function" is one of the most impor-
tant functions performed by a consulate. LEE, CONSULAR
LAW AND PRACTICE 125-88. Foreign nationals who are
detained within the United States find themselves in a
very vulnerable position. Separated from their families
and far from their homelands, they suddenly find them-
selves swept into a foreign legal system. Language
barriers, cultural barriers, lack of resources, isolation and
unfamiliarity with local law create "an aura of chaos"
around the foreign detainees, which can lead them to
make serious legal missteps. Linda A. Malone, *From
Breard to Atkins to Malvo: Legal Incompetency and Human
Rights Norms on the Fringes of the Death Penalty*, 13 WM. &
MARY BILL RTS. J. 363, 392-93 (2004).

In these situations, the consulate can serve as a
"cultural bridge" between the foreign detainee and the
legal machinery of the receiving state. William J. Aceves,
*Murphy v. Netherland*, 92 AM. J. INT'L L. 87, 89-90 (1998).
Of course, we assume that lawyers here are equipped to
deal with language barriers; we also assume they are
familiar with the law. Sometimes, however, the

assistance of an attorney cannot entirely replace the unique assistance that can be provided by the consulate. The consulate can provide not only an explanation of the receiving state's legal system but an explanation of how that system differs from the sending state's system. *See* Linda Jane Springrose, Note, *Strangers in a Strange Land: The Rights of Non-Citizens Under Article 36 of the Vienna Convention on Consular Relations*, 14 GEO. IMMIGR. L. J. 185, 195 (1999). This assistance can be invaluable because cultural misunderstandings can lead a detainee to make serious legal mistakes, particularly where a detainee's cultural background informs the way he interacts with law enforcement officials and judges.[1]

Obviously, the consulate can also assist in more practical ways. The consulate can do more than simply process passports, transfer currency and help contact friends and family back home. The consulate can provide critical resources for legal representation and case investigation. Indeed, the consulate can conduct its own investigations, file amicus briefs and even intervene directly

---

[1] Springrose offers *Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998), as an example: "Breard was under the false impression that by confessing and throwing himself on the mercy of the court, as is the apparent custom in Paraguay, he would be helping himself rather than assisting the authorities to secure his conviction and death." Springrose, *Strangers in a Strange Land*, 14 GEO. IMMIGR. L. J. at 195. Springrose also describes how some foreign detainees may be more likely to make statements to police officers because of a heightened fear of police brutality developed in their home countries. *Id.* at 195-96.

in a proceeding if it deems that necessary. LEE, CONSULAR LAW AND PRACTICE 125-88. Importantly, the consular officer may help a defendant in "obtaining evidence or witnesses from the home country that the detainee's attorney may not know about or be able to obtain."[2] Springrose, *Strangers in a Strange Land,* 14 GEO. IMMIGR. L. J. at 196. Many of the "protective functions" performed by the consulate will come to bear later in the present case.

## II.

On August 30, 2002, Osagiede met a man named Michael Braxton in a Sears parking lot in Chicago, Illinois. Osagiede handed Braxton a clear plastic bag containing 25 grams of heroin. Braxton handed him $3,000 in cash. Unbeknownst to Osagiede, Braxton was already in trouble with the law and had agreed to cooperate with federal law enforcement agents. The August 30, 2002 transaction was the second of two "controlled buys" that

---

[2] *Sanchez-Llamas* provides a striking example. In *Sanchez-Llamas*, Bustillo's defense was that another man, "Sirena," had committed the crime. Sirena, however, had fled back to Honduras; he was nowhere to be found. "Bustillo did not learn of his right to contact the Honduran consulate until after conviction, at which time the consulate located additional evidence supporting this theory, including a critical taped confession by Sirena." Mark J. Kadish & Charles C. Olson, Sanchez-Llamas v. Oregon *and Article 36 of the Vienna Convention on Consular Relations: The Supreme Court, The Right to Consul, and Remediation,* 27 MICH. J. INT'L L. 1185, 1218 (2006).

No. 07-1131                                                                  7

had been arranged by federal agents who had placed the participants under surveillance. Federal agents arrested Osagiede on March 13, 2003. The Government faxed a consular notification form to the Nigerian Consulate on the same day. The Government concedes, however, that it never notified Osagiede of his right to contact the Nigerian consulate, as Article 36 and federal regulations require.

Five days later, Osagiede and two co-defendants (Braxton and Henry Hicks) were charged in a superseding indictment with four counts of heroin distribution and conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 846. Attorney Kenyatta Tatum served as Osagiede's counsel for most of the proceedings. Tatum never informed Osagiede of his Vienna Convention rights and never raised the issue with the Government or with the presiding judge. On January 9, 2004, after Tatum insisted that Osagiede would face only an eighteen-month sentence, he pleaded guilty plea to one count of distributing 25 grams of heroin. See 21 U.S.C. § 841(a)(1).

The base sentencing level for the felony distribution of 25 grams of heroin was 18. The Government, however, planned to rely on co-defendant testimony and nine wiretapped recordings to establish that Osagiede had actually distributed 1,300 grams of heroin in similar drug transactions. This "relevant conduct" would increase Osagiede's base offense level to 32, creating a sentencing range of 121 to 151 months. In a sentencing proceeding before Judge Lefkow, Braxton and Hicks both testified against Osagiede. Braxton, who had closer contact with

Osagiede than did Hicks, estimated that he had bought approximately 1,300 grams of heroin from Osagiede. Braxton also admitted, however, that when he was asked by federal agents to identify Osagiede in a photo, he mistook Osagiede for his cousin, Akeem Lasisi, with whom Braxton also dealt. There were also questions about whether the phone number called by Braxton to set up the deals belonged to Osagiede or Lasisi. Lasisi had apparently returned to Nigeria and was nowhere to be found. The Government had made little or no effort to find him, despite his connections to the case.

Because of the inconsistencies in Braxton's testimony, it was important that the Government have corroborating evidence. The voices on the tape recordings, however, were difficult to decipher because the men had strong Nigerian accents. Osagiede vigorously denied that it was his voice on the tapes. Tatum told Osagiede that the only way to dispute the accuracy of the tapes was to hire an expert. Osagiede's family scrounged up the money, and Tatum sent the tape recordings to a voice analysis expert. For reasons that are somewhat unclear, the expert was only able to properly analyze one of the nine tapes. The analyst determined that the one recording that was properly analyzed did *not* contain Osagiede's voice. Tatum offered the analyst's report to the district judge at the sentencing hearing. Surprisingly, the Government admitted that Osagiede was not the man speaking on the ninth tape recording. The other recordings, however, appear to have been allowed in as evidence. The district court then found by a preponderance of the evidence that Osagiede had committed the relevant conduct and determined his base offense level to be 32.

Osagiede was finally sentenced on May 17, 2005 in a proceeding before Judge Kocoras. Osagiede explained that he had fallen in with the wrong crowd since his arrival in the United States. What he really wanted to do was to pursue an education—his family has a proud tradition of academic success—and he vowed to set himself back on track. The district judge noted that the evidence of relevant conduct presented "a close call." That issue, however, was already decided. The district judge sentenced Osagiede to 97 months in prison, which was below the recommended U.S. Sentencing Guidelines range. Osagiede did not appeal.

On April 25, 2006, Osagiede filed a pro se petition for a writ of habeas corpus in the Northern District of Illinois, contending, inter alia, that he was denied his Sixth Amendment right to the effective assistance of counsel. *See Strickland*, 466 U.S. 668, 104 S. Ct. 2052. Osagiede asserted that the Government failed to notify him of his right to consult with the Nigerian Consulate as mandated under the Vienna Convention. He argued, correctly, that the rights conferred by the Vienna Convention were individual rights. He also argued, correctly, that counsel's failure to know the laws applicable to his case could constitute constitutionally deficient performance. Osagiede then analogized the right to consular assistance to *Miranda* rights and claimed that dismissal of the indictment was the remedy that his counsel should have sought. But dismissal would not, in fact, have been an appropriate remedy.

On December 13, 2006, Judge Korcoras denied the petition without holding an evidentiary hearing. The

district judge did not revisit the "close call" on relevant conduct or the problems with the tape recordings. (Judge Lefkow had been the presiding judge at the relevant conduct hearing.) Judge Korcoras explained that dismissal of the indictment had never been recognized as a remedy for an Article 36 violation. Thus, it would have been "extremely unlikely that a motion to dismiss the indictment by Osagiede's attorney would have been successful." Osagiede's counsel was not ineffective for failing to raise an argument likely to fail.

Osagiede then filed a pro se application for a certificate of appealability on January 4, 2007, which we must accord a liberal construction. *See Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001); *Burris v. United States*, 430 F.2d 399, 402 (7th Cir. 1970); *Wilson v. Phend*, 417 F.2d 1197, 1199 (7th Cir. 1969). "[W]e can hardly demand of a layman and pauper who draws his petition behind prison walls the skill of one trained in the law." *Tompkins v. Missouri*, 323 U.S. 485, 487-88, 65 S. Ct. 370, 89 L. Ed. 407 (1945). Pro se petitioners will, at times, confuse legal theories or draw the wrong legal implications from a set of facts. *See Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). But we do not treat every technical defect as grounds for rejection.

Of course, Osagiede is required to construct his basic argument and to allege facts sufficient to support it. Here, Osagiede alleged a recognized and undisputed violation of his rights, under the federal regulation if not under the Convention itself. *See Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002); *Aleman v. United States*, 878 F.2d 1009, 1012-13 (7th Cir. 1989). Osagiede's legal argument

about why his counsel was ineffective may have referred to the wrong form of relief (dismissal of the indictment) but he nonetheless alleged the essential fact that the Government denied him consular assistance and his lawyer did nothing about it. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). As § 2255(b) suggests, a district court will sometimes have to "look beyond the face of the motion" to the record, *see Gallo-Vasquez v. United States*, 402 F.3d 793, 798 (7th Cir. 2005), and treat "unincluded allegations of apparent facts" as part of the petition, *see Williams v. Griswald*, 743 F.2d 1533, 1543 (11th Cir. 1984) (internal quotation omitted). As we shall explain more fully later, the record shows evidence of possible prejudice. Thus, the basic structure of Osagiede's argument is clear.

On May 22, 2007, we issued a certificate of appealability to Osagiede, finding that he had made at least a "substantial showing of the denial of a constitutional right" under the Sixth Amendment. 28 U.S.C. § 2253(c)(2). Osagiede is entitled to an evidentiary hearing unless "the files and the records of the case conclusively show that [he] is entitled to no relief." *See* 28 U.S.C. § 2255(b).

### III.

Ineffective assistance of counsel claims are, of course, brought to vindicate the Sixth Amendment right to counsel, since the right to counsel is the right to *effective* counsel. *See Strickland*, 466 U.S. at 687-96, 104 S. Ct. 2052. It has long been established that foreign nationals within the territory of the United States are protected by the

Sixth Amendment. *See Wong Wing v. United States,* 163 U.S. 228, 238, 16 S. Ct. 977, 41 L. Ed. 140 (1896). While Osagiede's Sixth Amendment claim centers on his lawyer's failure to raise an Article 36 violation, we must bear in mind that he is seeking relief under the Constitution—not under the Convention. *See Sanchez-Llamas,* 548 U.S. at 363-64 & n.3, 126 S. Ct. 2669 (Ginsburg, J., concurring) (noting that the defendant "did not include a Vienna-Convention-based, ineffective-assistance-of-counsel claim along with his direct Vienna Convention claim in his initial habeas petition").

The Government has taken the rather extreme position that Osagiede's ineffective assistance of counsel claim—indeed, *any* ineffective assistance of counsel claim based upon an Article 36 violation—fails *Strickland* as a matter of law. The Government asserts that no court has ever recognized that Article 36 confers individual rights in a criminal proceeding. Even if such rights were to exist, the Government argues, the Vienna Convention provides no remedy for their violation. Instead, the sole means of enforcing the Convention are through political and diplomatic channels. At oral argument, the Government even suggested that it would be inappropriate for us to entertain an ineffective assistance of counsel claim based on an Article 36 violation. That would be tantamount to recognizing a remedy for a Vienna Convention violation, something the Government believes to be *verboten.*

We must take a moment here to unpack the Government's argument. To begin, we believe that the Govern-

ment has failed to fully appreciate the distinction between treaty-based claims and constitutional claims. Because this is a Sixth Amendment ineffective assistance of counsel claim, it is controlled by *Strickland* and its familiar two-prong test. Whether rights and remedies are available under Article 36 of the Vienna Convention is relevant only to the extent that it helps prove or disprove one of these elements. As we know, the distinction between rights and remedies is often a slippery one. For simplicity's sake, we will discuss the question of individual rights under the deficient performance prong and the question of remedies under the prejudice prong. As we shall explain, we have always assumed that Article 36 confers individual rights, even in the criminal setting, and we stand by that position today. Further, we believe that there was a viable (and simple) remedy for the Article 36 violation alleged in this case: counsel could have informed Osagiede of his right to consular assistance and the violation could have been raised with the judge presiding at trial.

Before proceeding to our *Strickland* analysis, however, we must address the Government's argument that *Sanchez-Llamas* forecloses foreign nationals from bringing ineffective assistance of counsel claims based on Article 36 violations. A close reading of *Sanchez-Llamas* suggests otherwise. While the Court rejected the argument that the treaty itself required suppression as a remedy, the Court stressed that there were other means of "vindicating Vienna Convention rights." *Sanchez-Llamas*, 548 U.S. at 350, 126 S. Ct. 2669. Specifically, the Court stated that a defendant could raise an Article 36 violation as a part of

14

a broader constitutional challenge, such as a challenge to the voluntariness of a statement under the Fifth Amendment. *Id.*, 126 S. Ct. 2669; *see also United States v. Ortiz*, 315 F.3d 873, 886 (8th Cir. 2002).

More importantly, the Court suggested that the Sixth Amendment could also serve as a vehicle for vindicating Article 36 rights. In a telling passage, the Court noted that an attorney's failure to raise an Article 36 violation would not be "cause" for overriding a state's procedural default rules, unless *"the attorney's overall representation falls below what is required by the Sixth Amendment." Sanchez-Llamas*, 548 U.S. at 357 & n.6, 126 S. Ct. 2669 (emphasis added). The Court went on to explain that the attorneys in that case were aware of their clients' Vienna Convention rights and had made a strategic decision not to pursue them. *Id.* Thus, "nothing [had] prevented [the defendant] from raising an ineffective-assistance-of-counsel claim predicated on his trial counsel's failure to assert the State's violation of those rights." *Id.* at 364 & n.3 (Ginsburg, J., concurring). Because the defendants had abandoned their ineffective assistance of counsel claims, however, the issue was not before the Court.[3] *Id.* at 357 & n.6. The inclusion of this discussion in the Court's opinion was no accident: the viability of ineffective assistance of counsel claims had been discussed extensively at oral argument. Indeed, Justice Ginsburg stated that it was "critical" for her that the defendant did not raise

---

[3] This was also the case in *Medellin v. Texas (Medellin II)*, 552 U.S. ___, 128 S. Ct. 1346, 1355 & n.1, 170 L. Ed.2d (2008).

an ineffective assistance of counsel claim along with his direct Vienna Convention claim. *See Sanchez-Llamas*, 548 U.S. at 363-64 & n.3, 126 S. Ct. 2669 (Ginsburg, J., concurring). Through ineffective assistance of counsel claims, "'full effect' could [be] given to Article 36." *Id.*

Thus, we reject the notion that *Sanchez-Llamas* forecloses foreign nationals from bringing ineffective assistance of counsel claims based on Article 36 violations. In fact, *Sanchez-Llamas* appears to express a preference for subsuming Vienna Convention claims in broader constitutional attacks, rather than basing relief entirely on the treaty itself. With this general matter settled, we move to our *Strickland* analysis.[4]

---

[4] We find no problem with *Teague v. Lane*, 489 U.S. 288, 313, 109 S. Ct. 1060, 103 L. Ed.2d 334 (1989). Counsel's duty to know the applicable law, at least when it matters to his client's defense, has been clearly established by *Strickland* and its progeny. Two courts of appeals have already held that a reasonably competent attorney would be aware of Vienna Convention rights. *See Murphy*, 116 F.3d at 100; *Breard*, 134 F.3d at 619-20. Even if this particular application of *Strickland* had never before arisen, it would be of little legal consequence: "If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule. . . . Where the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." *Wright v.*

(continued...)

### IV.

To establish an ineffective assistance of counsel claim, Osagiede must show that (1) his counsel's performance fell below an objective standard of reasonableness when measured against "prevailing professional norms," and (2) but for the deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687-96, 104 S. Ct. 2052. We scrutinize each claim in light of the totality of the circumstances, *see id.*, after engaging in an individualized fact-based analysis. *Williams v. Taylor*, 529 U.S. 362, 391, 120 S. Ct. 1495, 1512, 146 L. Ed.2d 389, 416 (2000).

We review the denial of an evidentiary hearing for abuse of discretion. *See Bruce*, 256 F.3d at 597. When reviewing a decision to deny a petition for habeas corpus, we review factual issues for clear error and legal issues de novo. *See Galbraith*, 313 F.3d at 1006. The district court provided purely legal arguments in dismissing Osagiede's petition on the first prong of *Strickland*; our review is thus largely de novo.

An evidentiary hearing on a § 2255 motion is required unless the record "conclusively show[s] that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Ineffective

---

[4] (...continued)

*West*, 505 U.S. 277, 308-309, 112 S. Ct. 2482, 120 L. Ed.2d 225 (1992) (Kennedy, J., concurring). Neither do we consider the "appropriate accommodations" remedy suggested in *Sanchez-Llamas* to be a new rule of criminal procedure: it is simply an application of common sense.

assistance claims often require an evidentiary hearing because they frequently allege facts that the record does not fully disclose. *See Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir. 1994). Further, they generally require an evidentiary hearing if the record contains insufficient facts to explain counsel's actions as tactical, *see United States v. Leonti*, 326 F.3d 1111, 1122 (9th Cir. 2003), or if further factual development might demonstrate prejudice, *see Ivory v. Jackson*, 509 F.3d 284, 298 (6th Cir. 2007). We examine each of the prongs in turn.

### A.

Effective performance by counsel representing a foreign national in a criminal proceeding is reasonable performance "under prevailing professional norms." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. We must reconstruct the situation faced by Osagiede's counsel as it would have appeared to a reasonably competent lawyer representing a foreign national in Illinois in 2003. *Id.* at 689; *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993). We look to various sources in our attempt to reconstruct the situation (including statutes, regulations, case law and professional guidelines) but none of these sources alone is dispositive. *Strickland*, 466 U.S. at 688-89, 104 S. Ct. 2052.

Osagiede's claim is a common one in Sixth Amendment cases. In essence, Osagiede argues that his lawyer should have been aware of his legal rights under Article 36 and should have acted to protect them: "All lawyers that represent criminal defendants are expected to know the

No. 07-1131

laws applicable to their client's defense." *Julian v. Bartley*, 495 F.3d 487, 497 (7th Cir. 2007); *accord Dixon v. Snyder*, 266 F.3d 693, 702 (7th Cir. 2001); *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996); *Freeman v. Lane*, 962 F.2d 1252, 1258 (7th Cir. 1992). The Government does not contest the fact that it failed to notify Osagiede of his right to contact his consulate. This failure to notify violated Article 36 of the Vienna Convention, as well as federal regulations promulgated to ensure compliance with Article 36.[5] *See* 28 C.F.R. § 50.5. The law was on the books; the violation was clear. Simple computer research would have turned it up.

The Government argues, however, that Article 36 does not create any individual rights that could have been invoked by counsel as a basis for relief. Osagiede's counsel was not objectively deficient, the Government argues, because any argument she might have raised would be futile. *See Rodriguez v. United States*, 286 F.3d 972, 985 (7th Cir. 2002). In support of its argument, the Government asserts that no court had ever held that the Vienna Convention created individually enforceable rights in the criminal setting. This is simply incorrect: numerous courts had held by 2003 that Article 36 created individual rights, even in

---

[5] We note that the Government has not addressed the issue of whether the foreign detainee had a right under 28 C.F.R. § 50.5, which is a separate matter. *See, e.g., United States v. Calderon-Medina*, 591 F.2d 529 (9th Cir. 1979). Instead, it focuses strictly on the Convention itself.

the criminal setting.[6] The courts that did *not* hold that Article 36 created individual rights almost invariably assumed that Article 36 did confer individual rights.[7] In fact, a reasonable Illinois lawyer would have known that this Court has never held that Article 36 did not create individual rights; instead, we have always

---

[6] *See, e.g., Standt v. City of New York,* 153 F. Supp. 2d 417, 427 (S.D.N.Y. 2001); *United States v. Briscoe,* 69 F. Supp. 2d 738, 745-46 (D. V.I. 1999); *United States v. Miranda,* 65 F. Supp. 2d 1002, 1007 (D. Minn. 1999); *United States v. Torres-Del Muro,* 58 F. Supp. 2d 931, 933 (C.D. Ill. 1999); *United States v. Hongla-Yamche,* 55 F. Supp. 2d 74, 78 (D. Mass. 1999); *United States v. Superville,* 40 F. Supp. 2d 672, 677-78 (D. V.I. 1999); *United States v. Chaparro-Alcantara,* 37 F. Supp. 2d 1122, 1125 (C.D. Ill. 1999); *United States v. $69,530.00 in U.S. Currency,* 22 F. Supp. 2d 593, 594 (W.D. Tex. 1998); *United States v. Esparza-Ponce,* 7 F. Supp. 2d 1084, 1095-96 (S.D. Cal. 1998).

[7] *See, e.g., Sanchez-Llamas,* 548 U.S. at 343, 126 S. Ct. 2669; *Breard v. Greene,* 523 U.S. 371, 376, 118 S. Ct. 1352, 140 L. Ed.2d 529 (1998) (per curiam); *United States v. Minjarez-Alvarez,* 264 F.3d 980, 986 (10th Cir. 2001); *United States v. Chanthadara,* 230 F.3d 1237, 1255-56 (10th Cir. 2000); *United States v. Cordoba-Mosquera,* 212 F.3d 1194, 1196 (11th Cir. 2000); *United States v. Lombera-Camorlinga,* 206 F.3d 882, 885 (9th Cir. 2000) (en banc); *United States v. Li,* 206 F.3d 56, 61-62 (1st Cir. 2000); *Murphy v. Netherland,* 116 F.3d 97, 99-100 (4th Cir. 1997). The Government cites only two cases that have held that Article 36 confers no individual rights. *See United States v. Emuegbunam,* 268 F.3d 377, 386-95 (6th Cir. 2001); *United States v. Jimenez-Nava,* 243 F.3d 192, 195-200 (5th Cir. 2001).

assumed that it did.[8] *See United States v. Lawall*, 231 F.3d 1045, 1048 (7th Cir. 2000); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 622 (7th Cir. 2000). Thus, it was clearly established across the country that *either* the Vienna Convention created individual rights *or* courts would proceed as if it did.[9]

We also believe that an Illinois lawyer, in particular, would have known to raise the Article 36 violation. In the wake of *Breard*, three district courts in Illinois had squarely held that the Vienna Convention created individually enforceable rights. *See Madej v. Schoming*, No. 98 C 1866, 2002 WL 31386480, at *1 (N.D. Ill. 2002) (Coar, J.); *Torres-Del Muro*, 58 F. Supp. 2d at 933 (Mills, J.); *Chaparro-Alcantara*, 37 F. Supp. 2d at 1125 (Scott, J.). In *Chaparro-Alcantara*, the Central District of Illinois held unequivocally that foreign detainees had "an individual right to consular notification under Article 36."

---

[8] We have since held that Article 36 does confer individual rights. *See Jogi II*, 480 F.3d at 831-35. We need not discuss *Jogi II* at length; that opinion postdated the action here and therefore would not have been known to Osagiede's attorney. When *Lawall* and *Chaparro-Alcantara* are read in light of *Jogi II*, however, we believe it relatively clear that we have always recognized an individual right under Article 36.

[9] Of course, none of this obscures the fact that the United States Supreme Court has never upheld the Vienna Convention as a source of individual rights or obviated the possibility that the Court might, in the future, reach a contrary conclusion. Until the Court chooses to do so, however, we continue to assume that such rights exist.

*Chaparro-Alcantara*, 37 F. Supp. 2d at 1125. When the issue of individual rights arose again in *Torres-Del Muro*, the Central District stated flatly that it had "already addressed" the issue in *Chaparro-Alcantara* and reiterated that the defendant had "a private right to consular notification." *Torres-Del Muro*, 58 F. Supp. 2d at 933.

After *Chaparro-Alcantara* and *Torres-Del Muro* were decided, the International Court of Criminal Justice issued two landmark decisions holding that Article 36 did, in fact, provide the detained foreign national with individual rights. *See LaGrand Case (Germany v. United States)*, 2001 I.C.J. 466 (June 27, 2001); *Case Concerning Avena & Other Mexican Nationals (Mexico v. United States)*, 2004 I.C.J. 128 (March 31, 2004). The dramatic legal and political developments that led up to the *LaGrand* and *Avena* cases drew widespread attention at local, national and international levels.[10] Shortly after *LaGrand*, the Northern District

---

[10] *See, e.g.*, Roger Cohen, *U.S. Execution of German Stirs Anger*, N.Y. TIMES, March 5, 1999, at A14; Raymond Bonner, *U.S. Bid to Execute Mexican Draws Fire*, N.Y. TIMES, October 30, 2000, at A20; Douglass W. Cassel Jr., *Executions Land U.S. in Court*, CHICAGO DAILY LAW BULLETIN, November 17, 2000, at 5; Marlise Simons, *World Court Finds U.S. Violated Consular Rights of 2 Germans*, N.Y. TIMES, June 28, 2001, at A10; Peter Finn, *Court: U.S. broke pact by executing German in 1999*, CHICAGO TRIBUNE, June 28, 2001, at 4; Ginger Thompson, *An Execution in Texas Strains Ties With Mexico and Others*, N.Y. TIMES, August 16, 2002, at A6; Marlise Simons, *World Court Tells U.S. to Delay Executing 3*, N.Y. TIMES, February 6, 2003, at A13; Toby Sterling, *World Court orders*
(continued...)

of Illinois ruled that *LaGrand* had settled the issue of whether the Vienna Convention conferred individual rights. *See Madej*, 2002 WL 31366480, at *1. Its language was clear: "After *LaGrand*, . . . no court can credibly hold that the Vienna Convention does not create individually enforceable rights."[11] *Id. Madej* itself was discussed within the Chicago legal community. *See* Patricia Manson, *U.S. Judge Expands Rights of Foreigners*, CHICAGO DAILY LAW BULLETIN, September 26, 2002, at 1. The Government's failure to notify Osagiede of his Vienna Convention rights occurred only months after *Madej* was handed down, and Osagiede's sentencing hearing was held in the Northern District. In this situation, we believe that the Article 36 violation should have rung a bell with a reasonable attorney.

Further, at the time of Osagiede's sentencing, the Illinois Institute for Continuing Legal Education's *Guide for Defending Illinois Criminal Cases* stated in unequivocal terms: "Attorneys should advise all non-citizens clients that they have the right to consular notification of their arrest under the Vienna Convention and that such notification request should be made part of any assertion

---

[10] (...continued)
*U.S. to stay executions of 3 Mexicans*, CHICAGO TRIBUNE, February 6, 2003, at 3.

[11] Subsequent decisions have made clear that *LaGrand* and *Avena* did not conclusively settle the issue. *See generally Medellin II*, 552 U.S. ___, 128 S. Ct. 1346. We focus only on the effect of these two cases at the time—that is, before *Medellin II*.

of rights to silence and counsel . . . . [A]ttorneys representing non-citizens clients should advise them to invoke the Vienna Convention rights to the police and prosecutors at the police station and to the judge at the initial court appearance and should raise the issue during any motion to suppress statements." DEFENDING ILLINOIS CRIMINAL CASES § 4.2 (2003). As the Supreme Court has stated, "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." *Strickland*, at 688-89, 104 S. Ct. 2052.

To summarize, the Vienna Convention was the "Law of the Land" at the time, and 28 C.F.R. § 50.5 required federal agents to comply with it. Professional guidelines instructed lawyers to inform their clients of Article 36 rights. There were hundreds of cases in which courts *had* addressed those rights, even in a criminal setting, and these cases generated a decent amount of fanfare. Indeed, the district in which Osagiede's case was being heard had just ruled that foreign nationals had individual rights under Article 36. In this climate, we believe that Illinois criminal defense attorneys representing a foreign national in 2003 should have known to advise their clients of the right to consular access and to raise the issue with the presiding judge.[12]

_____

[12] There is a certain irony to the Government's claim that a reasonably competent attorney would not have known to have at least raised an Article 36 violation. Even before *Breard*, courts had recognized that Vienna Convention claims were

(continued...)

Of course, counsel may have a strategic reason for not doing so. In *Sanchez-Llamas,* for example, "defense counsel was the son of Salvadoran diplomats and was familiar with Article 36 issues, but he decided it would be better to limit the number of people to whom his client spoke." See Kadish & Olson, *The Supreme Court, The Right to Consul, and Remediation,* 27 MICH. J. INT'L L. at 1219. There is no evidence of a strategic decision in this record. Indeed, there is no evidence that Osagiede's counsel was even aware of Article 36 or the federal regulations enforcing it. While the Government claims that Osagiede's counsel used Lasisi as a "specter" to cast doubt on the Government's case, we have reviewed that portion of the sentencing transcripts and we are not persuaded. Ineffective assistance claims generally require an evidentiary hearing if the record contains insufficient facts to explain counsel's actions as tactical. *See Leonti,* 326 F.3d at 1122. Such is the case here.

## B.

We turn to the prejudice prong. Osagiede must show that "but for counsel's unprofessional errors, the result of the

---

[12] (...continued)
commonplace and that they would be deemed waived if they were not raised by counsel. *See Murphy,* 116 F.3d at 100 ("any reasonably diligent search by [defendant's] counsel . . . would have revealed the existence and applicability (if any) of the Vienna Convention"); *Breard,* 134 F.3d at 619-20 ("a reasonably diligent attorney would have discovered the applicability of the Vienna Convention to a foreign national defendant").

proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052. We focus, as Osagiede did in his petition, on the attribution of relevant conduct at sentencing, which significantly increased the length of his sentence and which the district judge admitted to be a "close call."

As we promised, we will now address the Government's argument that Osagiede could not show prejudice because there is no remedy for an Article 36 violation. In support, the Government relies on a series of cases that have held that suppression of evidence and dismissal of the indictment are inappropriate remedies for an Article 36 violation. The Government, however, has failed to show why these cases are relevant here. In their brief before the district court, the Government noted that Osagiede had not made any post-arrest statements and that no evidence was obtained as a result. The suppression cases are thus inapposite, *see, e.g., Li*, 206 F.3d at 61, as are the cases involving dismissal of the indictment, *see, e.g., Corboda-Mosquera*, 212 F.3d at 1196. The Government's contention that these cases show a general tendency of courts to "reject attempts to enforce the Vienna Convention" is too vague to be helpful.

There is, however, a more fundamental flaw in the Government's position on remedies. The Government seems to assume that the only recourse available to Osagiede's counsel would have been to file a motion for suppression or for dismissal, or perhaps to let the proceedings run their course and then raise the Article 36 violation on appeal. The Government focuses inordinately

on backward-looking remedies and ignores the fact that
the *trial court judge* is in a unique position to remedy an
Article 36 violation before prejudice has occurred. *Cf.
Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998) (Butzner,
J., concurring) ("The provisions of the Convention
should be implemented before trial when they can be
appropriately addressed"). Osagiede's lawyer could have
taken a simple action to remedy the Government's viola-
tion of his Article 36 rights: she could have informed
the foreign national of his rights and raised the viola-
tion with the presiding judge. As the Court noted in
*Sanchez-Llamas*, if a defendant "raises an Article 36 viola-
tion at trial, a court can make the appropriate accom-
modations to ensure that the defendant secures, to the
extent possible, the benefits of consular assistance."
*Sanchez-Llamas*, 548 U.S. at 350, 126 S. Ct. 2669. After being
apprised of a potential violation, "a court might . . . inquire
as to whether a defendant knows that he may contact his
consulate; it might even order that the prosecuting author-
ity allow a foreign national to contact his consulate." *Mora
v. New York*, 524 F.3d 183, 200 n.24 (2d Cir. 2008). The
record makes clear that Osagiede's counsel failed to
seek this modest remedy. This failure precluded Osagiede
from exercising his right to consular assistance and
may well have been prejudicial.

If Article 36 has been violated and counsel has failed
to remedy the violation, the question becomes whether
Osagiede is entitled to an evidentiary hearing to deter-
mine whether he has been prejudiced by the failure to
invoke the Convention. Two of the major issues to be
determined by an evidentiary hearing would be whether

the Nigerian consulate *could have* assisted Osagiede with his case and whether it *would have* done so. In order to merit an evidentiary hearing, Osagiede must indicate how he proposes to show a realistic prospect of consular assistance and provide some credible indication of facts reasonably available to him to support his claim. The district court, based in major part on these indications, may then exercise its discretion to conduct a hearing.

To show that concrete prejudice flowed from the deprivation of his right to notification, Osagiede must explain the nature of the assistance he might have received had he been alerted to his Article 36 rights. The record does reveal that Osagiede had a special need for services typically within the power of the consulate. Here, at the relevant conduct hearing, the Government presented nine tape recordings that allegedly contained Osagiede's voice. The tapes were difficult to decipher, however, because the speakers had strong Nigerian accents. In the end, only one of these recordings was properly analyzed. The Nigerian consulate might, perhaps, have provided the funds for a proper analysis of these tapes. The Nigerian Consulate might have been able to identify regional dialects, offer an accurate voice analysis or even translated the wiretaps itself. The Consulate could presumably have also located Lasisi, who was by then in Nigeria, and taken a statement from him. *See, e.g., supra,* n.3 (describing the evidence gathered by the Mexican consulate in *Sanchez-Llamas*). Lasisi was, after all, the man who had been previously mistaken for Osagiede and the man who may have been speaking on the tape recordings. The Nigerian Consulate appears to have been well situated

and well equipped to provide Osagiede with this kind of assistance. Thus, Osagiede has gone a long way toward showing that he deserves an evidentiary hearing.

Osagiede, however, faces another obstacle: having shown that the Nigerian consulate *could* have assisted him, he must also show that the Nigerian consulate *would* have assisted him. The decision to render assistance to a foreign detainee, which gives significance to the obligations imposed by the Convention, rests in the discretion of the Nigerian consulate. Perhaps the Nigerian consulate does not get involved in criminal matters; perhaps it would not have been persuaded that Osagiede deserved its assistance; perhaps it would have declined for other reasons. Osagiede must provide the district judge with a credible indication that the Nigerian consulate was in fact ready to render assistance in his case. These indications do not necessarily have to come in the form of an actual presentation in advance of the hearing of official documents, statements or affidavits from the Nigerian consulate, although such evidence might well be presented later at the hearing. In the case before us, a credible assertion of the assistance the consulate would have provided would entitle the petitioner to an evidentiary hearing.[13]

---

[13] Of course, if Osagiede obtains an evidentiary hearing, he will then have to do more than show a credible indication of the services the consulate would have provided. He will have to provide evidence sufficient to prove he was prejudiced by the failure to notify him of his Article 36 rights.

No. 07-1131 29

## V.

We cannot say that the record "conclusively shows" that Osagiede is not entitled to relief on his Sixth Amendment claim. *See* 28 U.S.C. § 2255(b). Osagiede's petition is GRANTED, the district court order is VACATED and the case is REMANDED for further proceedings in accord with this opinion.

9-9-08